5th Circuit. We have two cases to be orally argued today, but I'd ask you to stay within your time so that we can go on to other matters later today. We'll call the first case for this morning, United States of America excuse me versus Lindsey Johnson. We'll hear first from Mr. Scott. Good morning. My name is Mike Scott and I'm here on behalf of the appellant Lindsey Johnson. Lindsey Johnson and a gentleman named Jeremy McNeil had an incident on August 2, 2015 at an apartment complex in the northwest part of Jackson. As a result of that incident, Mr. Johnson was indicted on March 10, 2016 and charged with armed carjacking, felony possession of a weapon, and a brandishing count under 18 U.S.C. 924C for brandishing a firearm. A trial was held from May 17 to 19, 2016, where Mr. Johnson testified, Mr. McNeil testified, and two other individuals that were out there testified. Mr. Johnson and Mr. McNeil obviously agreed that they encountered one another, but their stories diverged at that point. Mr. Johnson's defense at the time is that Mr. and still is that Mr. McNeil was a drug dealer who he had called to talk to about an incident that happened the night before but turned into a drug deal. Mr. McNeil admittedly claims that Mr. Johnson robbed him. The two other individuals, Jamiah Haney and Jaron Thompson, were out there but only saw parts of what occurred when Mr. Johnson and Mr. McNeil encountered each other. The jury returned a guilty verdict on all three counts. Sentencing was held on August 2nd. A judgment was entered on August 16th, and an amended judgment was entered on August 25th. The amended judgment is not an issue in this appeal. It came about as a result of a post-trial motion. Originally, when this appeal was filed, there were five issues on appeal, the first issue being that the court erred by barring defense from entering into evidence Facebook postings, that the court erred by denying a motion for mistrial after the prosecutor listed or attempted to elicit prior convictions but did elicit the number of prior convictions of Mr. Johnson in violation of a stipulation that had been entered into under old chief. The third error was to add two levels for obstruction of justice based on Mr. Johnson testifying in his own defense. As I said, the issues were basically a contest between Mr. Johnson and Mr. McNeil. The fourth was error to increase his base offense level under the sentencing guidelines because of two prior misdemeanor convictions for armed carjacking, and the following was an error to deny an orator's motion to set aside count three, the 924C conviction, arguing that federal carjacking is not a crime of violence. In April, the government submitted a 28J letter as to that fifth issue, citing United States v. Jones, 854 F. 3rd, 737. It was a decision decided April 20th. I think the government submitted a letter on April 25th. It correctly notes that Jones foreclosed our fifth argument that federal armed carjacking is not a crime of violence, and therefore 924C applies. That is the law of the circuit. We just maintain the argument for purposes of appellate reasons. In case we get reversed again? Yes, Your Honor. The fourth issue, I must apologize to the Court, we argued that Mississippi carjacking is not a crime of violence because it fell under the residual clause of the sentencing guidelines. In March, Beckles v. United States was decided, which somewhat foreclosed that argument and said that the residual clause of the guidelines was not subject to void for vagueness challenges. However, it is still our position that it was error to find Mississippi armed carjacking was a crime of violence, primarily because the Court did not look at the statute as required. The Court looked at what Mr. Johnson allegedly did in those two prior convictions rather than elements of the crime. And so it is our position that it is still error that even if we do not prevail on the other issues, that should be remanded for re-sentencing. The first issue that we would focus on is the Facebook postings. During the course of the trial, it came to the attention of defense counsel that there were numerous photographs of Mr. McNeill with large sums of money, a gun, marijuana, leafy marijuana, including marijuana bud that had not been broken down. On cross-examination, he was asked about whether he was a drug dealer, where he got his money from. His answer to that was he only earned $250 a week at a personal home business of some sort, where he is working part-time. The photographs that are included in the record of appeal are not the actual photographs that are in the evidence. My office is currently trying to locate those with the District Court, but what is in there is copies. What was submitted at trial was color copies or screenshots of the Facebook postings. If they are found by the District Court, with this Court's permission, we would supplement the Yes, they are the same images, but because they are now in black and white, it is difficult to see some of the things clearly that Judge Barber saw, not only with the hard copy, but during the trial, defense counsel was able to plug in his laptop and show over the Elmo, outside the presence of the jury, these images on Mr. McNeill's Facebook. There's one with money in the mouth. One with a child holding money. With one of the pictures of the child, I think the one holding it says something to the effect, my baby's been through all this. One with drugs on a nightstand and a gun? Yes, Your Honor. All right. There's one with a large. Are you saying there's even better stuff that we couldn't see? You can see it better in color. All right. Because there's a picture of a grocery sack full of cash saying, this is my broke money. There's another picture that is even more telling. It's him with what appears to be a bag of marijuana, a whole bunch of cash. And we're not talking ones and fives. We're talking tens, twenties, hundreds. A whole bunch of cash, what appears to be a bag of marijuana, maybe a bottle of liquor that is better in color than it is in black and white. We argue, well, Mr. McNeill was asked about certain questions on those photographs or those images prior to prosecution objecting. Prosecution argued that under Rule 608, the defense counsel was attacking Mr. McNeill's character for truthfulness. However, what defense counsel was arguing was that he was attacking specific misrepresentations made by Mr. McNeill on the stand, not his overall character for telling the truth, but specific instances. And quite honestly, the 2003 amendment to Rule 608 says that it is limited to the witness's character for truthfulness, admissibility for other grounds of impeachment, such as contradiction, prior inconsistent statement, bias, and mental capacity is left to 402 and 403. Judge Barber recognized that even with those photographs, you could infer that Mr. McNeill had not been truthful on the stand in what he was saying because of the large amounts of money, because of the child, because of even the comments. Because in those pictures, you can see that they were posted by Mr. McNeill, not by someone else. And as was explained during the trial, had someone else posted it, their name would have appeared at the top and Mr. McNeill would simply have been tagged in Facebook. So you're saying he testified that he didn't post them? He did not testify. We never got to that point before. He identified the Facebook account as his account. I just want to make sure I understand your argument. You're saying he gave a statement on the stand that was contradicted by the photographs. You would have needed, I think, a very specific question and then a response that was inconsistent with what either was depicted or what information was shared at the time of the posting. The question was asked, do you want a gun? He said no. The picture that he posted from Facebook is a picture of a gun and a large sum of cash. He said it wasn't his gun. He posted it and he had the comment, let's turn it up, on his own Facebook post that he identified as his, or his page. He was asked, is he a drug dealer? He said no. There are pictures of, as I said, marijuana bud that had not been broken down. There's a picture of him with what appears to be marijuana in a baggie and large sums of cash as he's driving down the road, as well as possibly a bottle of liquor. He was asked, where do you work? He said a personal care home and that he only makes $250 a week. The amount of cash in the pictures, the ones with his daughter, the bag of cash in his car, the other cash in his lap in the picture in the car, contradict what he says is his income. So these were all elements for attack against him for specific instances and contradiction, as we said, under 608. And the court should have looked at it under the balancing factors of 403, but did not. The court even said on the record that it could be inferred that he was a drug dealer based on the marijuana and based on the cash. The clock's ticking, so let's assume that it was there to exclude that evidence. Why wasn't it harmless there? Your Honor, there are only two people that are primary witnesses in this case, Jeremy McNeil and Lindsey Johnson. Mr. Johnson argues that it's a drug deal gone bad. Additionally, that is further supported by the amount of drugs that are found in the car, although never weighed, it was testified to as a large quantity. So it is not harmless there because it goes directly to Mr. Johnson's defense. It impinged on his right to present a cross-examination of Mr. Johnson to the jury, the character that he has for not being truthful or his credibility specifically on the stand, not for his character for overall truthfulness. So it would not be harmless there in this case. It would be harmful. Even the case decided by the government for the proposition that it's not for character for truthfulness says to look at the balancing test to figure out if it comes in. The U.S. v. Morgan, it was another false statement made by the lady that went directly towards her defense. Skelton is similar, and Winters, which we incorrectly identify as Withers in our reply brief, and their argument in not having that allowed, in that case, Winters did not identify the picture. Didn't the testimony of the witnesses tend to what happened prior to a gun being pulled? She didn't know what happened prior to. Ron Thompson testified on direct and on cross-examination that he was walking away as Mr. Johnson was there. So they didn't necessarily corroborate what Mr. McNeil was saying. Just didn't contradict it. Didn't contradict it or corroborate it. The second issue is whether or not a mistrial should have been granted in this case. Mr., pursuant to a stipulation of, according to Old Chief, Mr. Johnson entered into an agreement with the government that he had a prior conviction. The first thing prosecutor asked on cross-examination was, you've been convicted of three crimes, have you not? Yes. Name them. Defense counsel objected, moved for mistrial. The stipulation in Old Chief goes towards not allowing the jury to be tainted by any prior convictions in order to convict him for this particular crime. The government, in attempting to elicit this, was trying to prejudice the jury because, quite honestly, Mr. Johnson's prior crimes are motor vehicle theft, armed carjacking, and armed carjacking. And so it's our position that the three that they elicited were, just even the number, was prejudicial. And not only if it wasn't, it is the court's decision to make that balancing test. Under 609, it says it must be admitted subject to probative versus prejudicial balancing test. And the prosecution never even gave the court the opportunity to do that. Didn't the court instruct the jury? They did not. That he was not being tried for his prior convictions? He did not. Thought he did. Did you ask for it? No, Your Honor. In candor, I did not ask for it. The test under U.S. v. Rodriguez versus Rodriguez-Lopez was the remark improper. It is our argument it was improper. He should never have elicited that. That's the court's discretion to determine the balancing test. You need to look at the prejudice, and it's the magnitude of the prejudicial remark. OCHIE stands for the proposition that a court does not want a defendant convicted based on extraneous circumstances or facts not relevant to the case at hand. As I said, the second part is efficacy of cautioning instruction. There was not one given. And the third, strength of the evidence supporting the conviction. As I said, Jemiah Haney and Jerron Thompson did not see the entire incident, said one was walking away, one came out after it had already begun. So it boiled down to a contest between Mr. McNeil and Mr. Johnson. Additionally, the government had argued that there was overwhelming evidence of his guilt, including flight from the police. As Mr. Johnson testified on the stand, he was scared of what the police would do. He was trying to get to friends' or family's house because he was afraid of them. And as the video that was submitted into evidence shows, he was rough-handled, exceedingly rough-handled. And Judge Barber even recognized at sentencing that McNeil had issues with his testimony, and that's on the record on appeal at 739. I've gone over my time. I know I have a little time left. I'd like to preserve it for rebuttal. But if there are any questions, I'll be happy to answer those. Okay. We'll save you five minutes on rebuttal, Mr. McNeil. I should have warned you. But you're next, Mr. Cleveland. Thank you, Judge Dennis. Good morning, Your Honors. Gaines Cleveland for the government. With me at the council table is Abe McLaughlin, who helped file this case. Turning first to the Facebook issue, Judge Barber acted well within his discretion in refusing to admit the Facebook postings of the victim, Jeremy McNeil. When confronted, McNeil readily admitted posting the images that he was asked about on the cross. Admitting the evidence of the Facebook postings into evidence, allowing the jury to see the Facebook postings, would have added nothing and had the potential to confuse and distract the jury, which Rule 403 seeks to guard against. This is a concern that this court recognized in Skelton, the opinion authored by Judge Dennis, we cite in our brief at page 23. There, the court referred to the trial judge's wide discretion in this matter. Here, the government told Judge Barber this extrinsic proof could just snowball and create a sideshow that would distract the jury from the issues. That's from record 165 and 167. The Facebook postings did not qualify as contradiction impeachment. The images did not serve to contradict the witness and the postings were not material to the case, nor to the defense. Whether the victim actually owned a gun or sold drugs was not relevant to whether McNeil was the victim of a carjacking. This is similar to the allegations deemed irrelevant in Skelton. McNeil's had posted a picture of a gun that he testified was not his and pictures of money that he testified belonged to a friend. That does nothing to prove he owned the gun or the money and says nothing about Johnson's justification defense. A person can use Facebook to cultivate an image, a persona that he wants to present, but just because it's on social media doesn't mean it's true. The defendant reports that the victim just because he posted them on Facebook. This Court said in Winners, the unpublished decision we cite at page 22, the Court said, a photograph's appearance on a personal webpage does not by itself establish that the owner of the page possessed or controlled the items pictured. We quoted that in our brief at page 22. Here, the postings didn't serve to contradict the victim or support the justification defense. There was no photograph of the victim on the Facebook page? There is no question that it's the victim's Facebook page. There's a picture of him. That's the first question that Mr. Scott asked about. Is this his issue? What is the picture of? And the victim said, that's a picture of me. Now, he didn't continue to press the witness. He could have. He was entitled to press the witness. He didn't say, is this your gun, is this your money? Well, he did say, is this your gun? You have a gun, he said. You have a gun. And he said, that's not my gun. And he said, did you get that gun and post that picture? And he said he did, but he said it was not his gun. And seeing the picture doesn't prove that it's his gun. So in any event, and this goes to a point that Judge Graves asked about, the refusal to admit to Facebook evidence is subject to harmlessness in view of other proof, as this Court said in Skelton. There were two other witnesses, and it was really up to the jury to decide who to believe, in addition to the victim. Both of them saw Johnson with a gun. You have Jaron Thompson, who testified that Johnson pulled out a gun and proceeded to rob McNeil and then sped off with his car. Here's an eyewitness. He said he was close enough to see this. That's a record at 113. And then Jamia Carney, one of the neighbors, testified she saw a young man with a gun drawn to a car, and then the driver surrendered the car. And her description matched what Johnson was wearing in Government Exhibit 8A, and that's from record at 314. And, of course, you've got Johnson's high-speed chase with the police, which belied that he was simply fleeing from the victim out of fear. Johnson, of course, stopped, picked up a passenger, and he led the police on a circuitous route from North Jackson towards downtown and back, as shown in Figure 1 of our brief, page 8. There's nothing that justified this conduct. There was no duress, no necessity, as the defendant argued. And the defense was given. There was a self-defense instruction that the jury was provided, so the jury was able to consider this defense. But more importantly, on the harmlessness point, is what the defendant himself said. Mr. Scott referred to the videotaped interview. That's Government Exhibit 34. He was interviewed after the incident. He gave his version then, and then at trial, he gave a different version. He just talked about doing a drug deal. That's record at 327. But he told the police that McNeil tried to rob him, and he said nothing about drugs. Johnson said that McNeil told him to sit in his car to look at, presumably, drugs, record at 345. But even in defendant's version, McNeil didn't authorize him to steal the car. Johnson said he was looking in the center console when he saw the gun. That's from record at 328 of the defendant's testimony. But he told the police that McNeil had the gun out. At another point, he said he had the gun in his lap. I thought he said McNeil said, put your money in the center console, and that's when he saw the gun. That's correct, Your Honor. That's exactly right. That's what he testified at trial. What he told the police was that McNeil, the victim, had his gun out already. And then at one point, he said the gun was in his lap. So these are tensions between what he told the police and what he testified at trial. The jury was able to see that, and it goes to basically making the story, the defendant told, one that just lacked credibility. Johnson said that he knocked the gun out of McNeil's hand when he reached for record at 329. And then he said he grabbed the gun, what he told the police. And Johnson said he took the car out of fear for his life. That's from record at 345. But he told the police that McNeil was so scared, he jumped out of the car when Johnson took the gun from him. And, of course, we've got Johnson's testimony that he intended to return the car. But, of course, he stopped to pick up the girl, and he led the police on the high-speed chase all over Jackson. Judge Barber, at the sentencing, said the defendant's story made no sense. That's what he said in record at 739. Now, as far as the question of the mistrial, which the defense said was required, when Johnson testified in his own defense, the government was entitled to ask him about prior convictions. And the Supreme Court's decision in Old Chief says nothing about cross-examining a defendant about his priors when he takes a stand. But it's limited to cases involving proof of felon status. That's from Note 17 of the decision, which we cite at page 28. This didn't violate the party stipulation, which simply was for the purpose of avoiding the need to offer the prior convictions as an At the Court's discretion — at the Court's direction, the government did no more than confront Johnson with the fact of his having these priors, three priors, that when the government — when the government asked Johnson to name them, the Court sustained the defense objection. And nothing further was said about the number or the nature of the priors. What was the purpose for the government's question? Impeachment of the defendant who took the stand. And that's record at 335. Our position is that the mere mention of the number of priors without identifying them did not justify a mistrial under the circumstances in which Judge Barber acted with his — in his discretion in refusing to grant one. The jury was obviously already aware of Johnson's status as a convicted felon. He, in his own testimony, mentioned having been to prison. The mere mention of the number of priors, we argue, is not unduly prejudicial. It's the nature of the earlier crimes that was a concern in Old Chief, and that was never revealed here. Now, in his reply brief, Johnson shifts the focus from a claim that the Court erred in declaring a mistrial to a claim that he erred in not conducting an on-the-record balancing. That's not something that was raised in the opening brief. And I point this Court to the Stanford decision and other decisions of this Court which indicate that the defendant waives a position that they don't articulate in their opening brief. But, of course, not only is his claim tardy, but our position is that the judge is limiting the government to only the number of priors achieved the purpose in the event, and that Judge Barber did properly refuse to declare a mistrial. Mr. Scott said that the — as far as the Mississippi armed carjacking statutes, that the judge improperly looked at the underlying facts. Well, our position is that the elements of the Mississippi armed carjacking statute are sufficient and that any — to the extent the Court relied on any other sources, that that — doing so would be harmless. We say that in our brief at page 39, note 11, and we cite the Court's Lipscomb decision, which is referred to there. Mr. Scott refers to the color pictures, which I haven't seen, that apparently you can see marijuana buds, according to him. But there's no one — there was no one to authenticate what was in those pictures. He may say there were marijuana buds. I don't know. To show them to the jury in a raw fashion like that, I think, had the potential to be — to be confusing and really distracting and is not appropriate. Anyway, that's not what this defendant — the victim was not on trial, and this didn't add anything to the defense, the duress, justification defense that the defendant put forward. For these reasons, Your Honor, I ask that the Court to affirm. Thank you. Mr. Scott, you have five minutes on rebuttal. May I proceed, Your Honor? The government argues that under Skelton and under Winters that the Facebook and Skelton, however, were that Skelton was trying to have admitted — or was trying to have admitted specific acts of dishonesty in the past to show his overall character for truthfulness in testifying. In contrast, in this case, we were trying to show specific acts of lying on the stand. And so it was not — it was used under 60A to show impeachment or contradiction. And even in Skelton, it says, this, the confrontation clause — or thus, the confrontation clause is generally satisfied when a defendant has been permitted to expose to the jury the facts from which jurors, as a sole charge of fact and credibility, could appropriately and could draw appropriate and raw inferences relating to the reliability of the witness. By trying to cross-examine Mr. McNeil on those Facebook postings and having been cut off, we were not allowed to put that before the jury, which is a fact that it should have been allowed. Obviously, Mr. — the jury — as the Court recognized, the district court recognized, the jury could have drawn the inference that he was a drug dealer, that this was a drug deal gone bad, and that there was a problem with these two stories, and specifically that he lied on the stand. But there's a whole bunch of different ways to explain what showed up in photographs, isn't it? I mean, what the Court said is, this is going to take the jury off on some — on a whole different journey that's not necessarily helpful with regard to disposing of this case. Wasn't that the ruling, at least in part, when the Court decided to exclude the photographs? Your Honor, the Court looked at — well, the argument made at trial by the government was that it was being — that the defense counsel was offering it for overall character for truthfulness. And the Court looked at the amendments to — But you're saying you wanted to contradict a very specific answer that he had given on the witness stand? Exactly. So one of the questions would have been, how much do you earn per week? And he said $250. That is correct. So a picture of $500 is a picture of $500. That doesn't mean you must be doing something else if you can post a photo of $500. Well — I got a 64 Chevy Impala SS. I have a very close friend. He has a picture of my car. He posted it on his Facebook page. He didn't say it's not my car, and he didn't say it is. But a whole lot of people liked the photo of the car, and a lot of them, I'm sure, assume it's his car. Well, and the government made the same argument at trial in trying to show and argue that you can take a picture next to a Porsche and say it's yours and pretend it's on — Well, not say anything about who — Or not say anything. The problem is, you're talking about a car versus illegal activity, and coupled with the at least — Cash — it's not illegal to possess cash. It is illegal to have drugs, and one of the pictures has a large quantity of cash sitting in Mr. McNeil's lap with marijuana. The other one is what can easily be discerned as bud in his car. But the picture wouldn't necessarily establish that he actually possessed the marijuana, or that he was even there when the picture was taken, would it? If he's holding it, Your Honor, it absolutely — If he's holding the marijuana? Yeah, and he was. In one of the pictures, he was holding marijuana. And so the pictures — and in one of the other pictures, it is clear, and Judge Barber recognized, that he's smoking marijuana. So it goes directly towards his credibility on what he said on the stand. If the question is, have you ever smoked marijuana, then I guess this would be an inconsistent if he's actually smoking it. Correct. Yes, Your Honor.  No, Your Honor. I have a short amount of time, but I'll quickly note that the chase lasted only about six minutes, and although it's characterized as a long, circuitous route, it was not — in the context of Northwest Jackson, it was not a long chase. The government argues that, as to the mistrial issue, that we have suddenly argued the 609 factors in our plea brief. However, at trial, we argued both 609, probative versus prejudicial, as well as the number in violation of Old Chief. And the argument for 609 was made at 338 on record on appeal. I assume my time is up. For all these reasons, we'd ask the Court to overturn Mr. Johnson's conviction, remand this case to the District Court for a new trial. Thank you. Thank you, sir.